### NORTHWEST AUTO CO. v. HARMON.

(Circuit Court of Appeals, Ninth Circuit. May 6, 1918.)

#### No. 3057.

1. CORPORATIONS ☞34(8)—ESTOPPEL TO DENY CORPORATE CAPACITY.

Where parties contracted and dealt with each other as corporations, although the name of plaintiff's assignor had not been changed, as assumed, each is estopped to deny the corporate capacity of the other, and defendant's contention that the contract was not assignable, because it relied on the skill of one who signed as president of plaintiff's assignor, cannot be sustained.

2. SALES ☞96—CONTRACTS—CONSTRUCTION.

A provision in a contract for the sale of motorcars to a dealer for resale, whereby the seller reserved the right to reapportion the territory if in its opinion the dealer was not properly promoting sales, was designed only to secure to the seller proper effort on the part of the dealer, and did not warrant cancellation for other reasons.

3. SALES ☞417—CONTRACTS—CANCELLATION—EVIDENCE.

In an action for damages for breach of a contract to furnish a dealer with motorcars for resale, evidence *held* insufficient to warrant the seller in canceling the contract on account of any lack of effort or inability, etc., on the part of plaintiff, to whom the contract was assigned.

4. SALES ☞418(12)—DAMAGES—MEASURE—PROFITS.

Where defendant broke a contract to furnish motorcars to a dealer for resale, though the dealer had made contracts for the sale of more than half of the cars it was to receive, and could readily have disposed of the remainder, the profits on resale were so reasonably certain as to be recoverable as damages.

5. SALES ☞417—CONTRACTS—ACTIONS FOR BREACH—EVIDENCE.

In an action for breach of contract to furnish motorcars to a dealer for resale, which provided that it should be subject to the prior orders of other dealers, evidence *held* insufficient to show that defendant was justified in failing to furnish cars as agreed because of the prior orders of other dealers.

6. SALES ☞192—PERFORMANCE—PAYMENT—ACCEPTANCE.

Where a contract to furnish motorcars to a dealer for resale was conditioned upon the dealer's payment of a specified note, the seller's acceptance of payment in installments was binding, and precluded it from denying responsibility on the ground that the note was not paid as required.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

7. SALES ☞417—CONTRACTS—BREACH—EVIDENCE.

In an action for damages for breach of contract to furnish a dealer with motorcars for resale, evidence *held* to warrant a finding that the seller was not warranted in canceling the contract, which had been assigned to plaintiff, on the ground of plaintiff's inability to carry it out.

In Error to the District Court of the United States for the Northern Division of the Western District of Washington; Jeremiah Neterer, Judge.

Action by the Northwest Auto Company, a corporation, against G. H. Harmon. There was a judgment for defendant, and plaintiff brings error. Affirmed.

The foundation of this action is a contract in writing, entered into October 17, 1914, between the plaintiff in error, an Oregon corporation and the distributor in the Northwest for the manufacturers of the Reo automobiles, and the Harmon Motorcar Company, of Seattle, Wash., for the sale of those automobiles within certain counties of the state of Washington. In the contract the plaintiff in error is designated as the seller and the Harmon Company as the dealer, and by its first paragraph the seller agreed to sell and the dealer to buy, during the period extending from the date of the contract to July 31, 1915, 100 Reo automobiles f. o. b. Lansing, Mich., sight draft against bill of lading, with exchange, unless otherwise agreed, the automobiles to be as described in the manufacturers' catalogue (with certain exceptions unimportant here) for distribution within certain specified territory of the state of Washington, embracing certain named counties, including that part of King county lying north of Auburn, and as a part of the consideration for the granting of that right the dealer (in paragraph 2 of the contract) agreed to push the sales of that machine to the best of its ability within the territory named, and also not to make any sale in any territory other than that specified, and to refer all inquiries, upon their receipt, for said machines from outside of that territory, to the seller—the latter stipulation being expressly declared to be vital, and for the violation of which the dealer agreed to pay to the seller, for each and every violation of it, the sum of $250 as liquidated damages, with the further agreement that "the seller may also cancel this contract for any such violation."

Paragraph 3 of the agreement is as follows: "The seller reserves the right to reapportion this territory at any time during the life of this contract, if in the opinion of the seller the dealer is not properly promoting the sale of Reo cars in all or any part of the above-described territory, but shall give at least 10 days' notice of such reapportionment." By paragraph 4 it was declared that each automobile should be sold by the seller to the dealer at the price of $1,000 f. o. b. Portland until December 1, 1914, when a discount of 22½ per cent. would be allowed the dealer on all cars sold, the dealer to report at the end of each week to the seller all names and addresses of parties purchasing cars from the dealer during that week, together with the factory number of the car or cars sold. By paragraph 5 it was agreed that all repair parts for the automobiles would be invoiced by the seller to the dealer at the manufacturers' current list price, less a discount of 20 per cent., and that all bills for repair parts should be due and payable on or before the 10th of the month following shipment; no exclusive territory being given on such parts. By paragraph 7 the dealer agreed to deposit with the seller $750 as a guaranty for the satisfactory performance of the contract, such deposit to be returned upon the termination of the contract, less any amount that might then be owing to the seller for repair parts, accessories, or to cover commission on cars sold outside of the described territory. By paragraph 8 the dealer agreed to accept delivery of the machines according to a specified schedule, and to furnish detailed specifications at least 30 days prior to the date of delivery; and, continues paragraph 8: "In the event the dealer fails to furnish the sell-

er detailed specifications at least 30 days prior to the 1st of the month during which shipment is to be made, the seller may deduct such cars from the total allotment and dispose of them as he sees fit, or cancel this agreement at his election."

Paragraph 10 is as follows: "This agreement is contingent upon delays due to strikes, floods, accidents, or any other causes beyond the control of the manufacturer or seller, whether occurring in the plant of the manufacturer or in that of any concern from which the manufacturer or seller purchases parts or equipment, and the shipment of the said Reo automobiles covered by this contract is to be made as above specified, subject to the prior orders of other dealers, and as the business of the manufacturer will permit."

By paragraphs 11 and 12 it was declared that the contract should become effective from the date of its execution, and that the place of its performance should be the city of Seattle, state of Washington—the signatures thereto being as follows: "The Northwest Auto Company [the seller] by F. W. Vogler, Pres. Harmon Motor Car Company [the dealer] by F. E. Harmon, Pres."

Annexed to the contract, and similarly signed, is a further provision as follows: "It is agreed and understood that the attached contract will only be made good and expire on July 31, 1915, provided a certain note amounting to twenty-three hundred and ninety-four and $03/100$ ($2,394.03) dollars, falling due in thirty (30) days from date, is paid promptly on the due date, and it is further agreed and understood that this clause is made part and parcel of the attached contract, the same as if it had been written or printed therein."

The complaint in the case alleged, among other things, that the Northwest Auto Company was during all the times therein mentioned engaged in the sale of automobiles in the state of Washington, and entered into the contract on the date therein mentioned with the Harmon Motorcar Company, and that in reliance thereon the latter company established certain distributing points in the territory awarded to it by the contract, equipped a salesroom, shop, and garage in the city of Seattle, advertised the said Reo cars for sale, employed salesmen, and in all respects properly prepared to carry out its part of the contract, notwithstanding which the Auto Company, defendant to the action, on February 22, 1915, after delivering to the Harmon Motorcar Company but nine of the automobiles, without cause and without fault on the part of the Motorcar Company, canceled the contract and refused to deliver any more cars thereunder; that on the 1st day of February, 1915, the said Harmon Motorcar Company assigned and transferred to the present defendant in error, plaintiff in the court below, all its right, title, and interest under the contract, and all claims it had against the Auto Company, of whatever nature, including its cause of action for the said breach of the contract, and alleged that if the defendant Auto Company had complied with the terms of the said contract, and had furnished the cars which by its terms it had agreed to sell and deliver to the Harmon Motorcar Company, that company could and would have sold all of the said cars, at a profit to itself of $13,727.10, in which amount the complaint alleged the plaintiff was damaged by the action of the defendant company, and for which amount judgment was prayed, together with costs of suit.

The answer of the defendant admitted its corporate capacity, the execution of the contract, and its delivery to the Harmon Motorcar Company, prior to February 22, 1915, of eight of the automobiles it had contracted to sell to it, and as a first affirmative defense alleged that at the time of the execution of the contract F. E. Harmon (who was the husband of the plaintiff in the case) represented that the Harmon Motorcar Company was a corporation and that he was its president, but that subsequently the defendant ascertained that such company was merely the trade-name under which he did business; that by paragraph 3 of the contract the Auto Company reserved the right to reapportion the territory described in the contract at any time during its life if in its opinion the Motorcar Company was not properly promoting the sale of the cars in all or any part of the territory described in the contract, but should give at least ten days' notice of such reapportionment; that after F. E. Harmon, trading as the Harmon Motorcar Company, had entered upon the performance of the contract, and in the month of January, 1915, the defendant Auto Company ascertained that Harmon was drinking to excess and

neglecting the business of selling the cars, and had been arrested and was lodged in jail, charged with disorderly conduct, and in those circumstances telegraphed the president of the Auto Company at Portland, Or., to come to Seattle, which request was complied with, and where the president of the Auto Company found F. E. Harmon in jail, and his wife, the plaintiff in the cause, in charge of the business of the Harmon Motorcar Company; that the president of the Auto Company thereupon informed the plaintiff that the contract would be terminated "as by its terms provided," whereupon the plaintiff asserted that she could herself carry out the terms of the contract, but that upon inquiry it was ascertained that the said F. E. Harmon and the Harmon Motorcar Company were each wholly without credit and without any means of carrying out the contract, and "that said F. E. Harmon had wholly failed to purchase cars as provided by paragraph 8 of said contract," and was in default in the matter of the payment of the note mentioned in the clause of the contract that has been quoted, and that the defendant Auto Company canceled the contract of sale after it had ascertained that neither the plaintiff nor the Harmon Motorcar Company had sufficient funds or credit to fulfill the contract, and after the plaintiff had, on or about February 20, 1915, finally informed it that she was unable to borrow any money or secure the means with which to do so—the answer expressly alleging: "In this connection the defendant states to the court that, had the plaintiff been able to secure the capital necessary to conduct the business, and had she been able to have carried out said contract, this defendant would have been ready and willing to have had the same carried out by her as representing the said Harmon Motorcar Company; that this defendant only terminated the said contract when finally informed that neither the plaintiff nor the Harmon Motorcar Company would be able to fulfill the contract or carry it out by its terms or otherwise." In a second affirmative defense, the defendant to the action pleaded that neither the Harmon Motorcar Company nor the said F. E. Harmon paid the note for $2,394.03, mentioned in the clause annexed to and made a part of the contract, when it became due, or at all, and further alleged "that after the lapse of 10 days from the date of the service of said notice of termination, to wit, on or about March 4, 1915, the said contract was terminated, and the said territory was by the defendant reapportioned and assigned to Messrs. Sharp & Leader, automobile dealers, in the city of Seattle."

In her reply to the last-quoted allegation of the answer, the plaintiff admitted the termination of the contract, but denied its other allegations, and also put in issue the allegation of the nonpayment of the $2,394.03 note, and, on the contrary, alleged that it had been fully paid, and that the payment thereof was accepted by the defendant Auto Company.

During the trial the defendant filed with the permission of the court an additional affirmative defense, in which it alleged in substance that it had not furnished to the Harmon Motorcar Company, at the time the contract of sale was canceled, the number of cars thereby required, but had furnished it all the cars it could procure from the manufacturers that were not allotted under contract to other agencies, and that, if the Harmon Motorcar Company had suffered damages thereby, it was not through the fault of the defendant, but due to its inability to procure the cars, and that, if the contract had not been canceled by it, it would have been unable to furnish to the Motorcar Company the entire number of cars it had agreed to sell between the date of the cancellation of the contract and of its termination under its terms, because of the inability of the defendant to procure the cars.

The trial resulted in a verdict for, the plaintiff for $13,727.10, of which $983.95 was remitted, and a judgment entered in favor of the plaintiff for $12,743.15, with costs.

Kerr & McCord and J. N. Ivey, all of Seattle, Wash., and Stephen V. Carey, of Spokane, Wash., for plaintiff in error.

Samuel H. Piles, Dallas V. Halverstadt, Fred H. Lysons, and Piles & Halverstadt, all of Seattle, Wash., for defendant in error.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above).   [1] The main contention on the part of the plaintiff in error is that the contract was not assignable, for the reason that it entered into it because of the personal characteristics of F. E. Harmon, relying on his ability to sell the Reo machines; that every one has the right to select and determine with whom he will contract, and cannot have another thrust upon him without his consent.   Conceding to the fullest the latter proposition, it does not apply to this case, for this contract was not made with F. E. Harmon individually, but with the Harmon Motor car Company of which, according to the express terms of the contract, he was president.   In their brief counsel for the plaintiff in error say:

"The Harmon Motorcar Company mentioned in said contract was supposed by the plaintiff in error, the Northwest Auto Company, to be a corporation, and the record shows that there had formerly been a corporation known as the McKenna-Harmon Company.  Mr. McKenna afterwards retired, and it was sought to change the name of the company to the Harmon Motorcar Company, and papers seem to have been prepared with that end in view; but such consummation seems never to have been brought about, owing to the fact that the papers were never legally filed.  The business, however, of what had formerly been the McKenna-Harmon Company, continued to be transacted under the name of the Harmon Motorcar Company.  As above stated, the plaintiff in error assumed, in dealing with the Harmon Motorcar Company, that it was a corporation, and that F. E. Harmon was the president and general manager of the same, and it was in full reliance upon F. E. Harmon individually having full control of the management and operation of the business that said contract was entered into.  No negotiations were made with any person in connection with said contract other than F. E. Harmon.  If the Harmon Motorcar Company was not a corporation under the facts as they exist, then the Harmon Motorcar Company was, so far as the plaintiff in error was concerned, merely the trade-name of F. E. Harmon."

It is not contended, either in the pleadings or proofs, that the contract as executed was not the mutual agreement of the parties, nor that any mistake or false representation was at any time made.  Indeed, we find in the record this admission of counsel for the plaintiff in error:

"The evidence clearly shows that the Harmons believed implicitly they were a corporation organized under the name of the Harmon Motorcar Company.  Now, it is fundamental they couldn't deceive anybody actionably, unless they did it deliberately and knowingly."

The contract was executed by each party as a corporation, and contained no provision regarding the personal services of F. E. Harmon or any other particular person.  Without conflict the evidence shows that a corporation called McKenna-Harmon Company was engaged in the business of selling motorcars, having commenced such business in 1912, and that McKenna shortly thereafter sold his stock in that corporation to F. E. Harmon and his wife (the present defendant in error), and that steps were thereafter taken to change the name of the corporation to Harmon Motorcar Company, and that papers were executed to carry that intention into effect and left with an attorney to be filed, who neglected to do so, of which fact neither

of the parties to the contract here involved had knowledge until February, 1915—it being theretofore supposed by both parties to this contract that the papers referred to had been filed. The parties having contracted and dealt with each other as corporations, each is estopped to deny the corporate capacity of the other. Whitney v. Wyman, 101 U. S. 392, 25 L. Ed. 1050; Ivy Press v. McKechnie, 88 Wash. 643, 153 Pac. 1067.

[2] It appears without dispute that the contract was prepared by the plaintiff in error, expressly reserving therein the right to cancel it in but two instances, to wit, in those instances specified in paragraphs 2 and 8. The contention that the right of cancellation on the part of the plaintiff in error also arose from that clause of paragraph 3 by which the seller reserved the right to reapportion the territory at any time during the life of the contract, if in the opinion of the seller the dealer was not properly promoting the sale of the cars, is without merit. It is apparent from the mere reading of that clause that it was designed only to secure to the seller proper effort on the part of the dealer to make sales of the cars, and in the event the latter did not, in the opinion of the seller, make such effort, then to confer upon the seller the right to again apportion the territory it had by the contract assigned to the dealer within which to make sales. Such is the clear and only meaning that can be properly drawn from the express language of that clause. It had no reference even by inference to any cancellation of the contract, which was expressly provided for, as has been shown, in paragraphs 2 and 8.

[3, 4] Nor, according to the record, did the evidence in the case afford the slightest ground for complaint of any lack of effort on the part of the dealer to sell the cars within the allotted territory. On the contrary, it shows without conflict that the Harmon Motorcar Company was well equipped for the business it undertook under the contract, having one of the best locations in the city of Seattle, subagencies in various parts of the territory assigned to it, a well-equipped service and repair shop and garage in Seattle, promptly sold all the cars the plaintiff in error delivered to it, had procured purchasers for a large number of the remaining cars the plaintiff in error had contracted to deliver, and had made urgent and repeated requests of the plaintiff in error for such delivery without avail, and there was evidence given tending to show that it could and would have easily sold, within the allotted territory and within the time specified in the contract, the whole of the remaining number of cars the plaintiff in error agreed to sell and deliver to it. For the appellant's default in that regard we therefore regard it as clear that the defendant in error was properly awarded by the jury damages in the amount that she and her predecessor in interest would have realized, had the plaintiff in error performed its part of the contract. Fifty-seven of the 100 cars the plaintiff in error contracted to sell and deliver to the Harmon Company the latter company had, according to the uncontradicted evidence, actually sold, while the plaintiff in error actually delivered but 9 of them; and there was abundant evidence to justify the jury

in finding in effect that the remaining 43 cars could and would have been sold within the stipulated time, had the plaintiff in error observed its agreement to deliver them. That such reasonably certain profits are recoverable as damages is well settled. Anvil Mining Co. v. Humble, 153 U. S. 540, 14 Sup. Ct. 876, 38 L. Ed. 814; United States v. Behan, 110 U. S. 338, 4 Sup. Ct. 81, 28 L. Ed. 168; Wakeman v. Wheeler & Wilson Mfg. Co., 101 N. Y. 205, 4 N. E. 264, 54 Am. Rep. 676; Federal I. & B. B. Co. v. Hock, 42 Wash. 668, 85 Pac. 418.

[5] Plaintiff in error points to the provision of paragraph 10 to the effect that the shipment of the machines covered by the contract should be "subject to prior orders of other dealers, and as the business of the manufacturer will permit," and contends that not more than 40 or 50 cars could have been furnished by the plaintiff in error subsequent to the termination of the contract, had it not been broken. It was, however, shown by the plaintiff in error's own records that prior to the execution of the contract here involved it had contracted to sell and deliver only 60 of the Reo cars, and that between October 17, 1914, and July 31, 1915 (the period covered by the contract), it had received from the manufacturer 350 of the cars.

[6, 7] The record shows that, when the president of the plaintiff in error went to Seattle in response to the telegram from F. E. Harmon, he found the latter in jail charged with disorderly conduct, and then visited the place of business of the Harmon Motorcar Company, where he found the present defendant in error in charge. There was conflict in the testimony regarding what occurred between the two in respect to the contract and the financial ability of the defendant in error to carry out the obligations imposed thereby on the Harmon Motorcar Company. The record shows that, after the arrival of Vogler, the president of the plaintiff in error, in Seattle, in response to Harmon's telegram, the latter assigned all of his stock in the McKenna-Harmon Company, as well as all of his interest in the Harmon Motorcar Company, to the defendant in error, which assignments, according to the testimony of the latter, were made at the instance of Vogler, of which testimony we find no contradiction in the evidence, but, on the contrary, some confirmation of it in this excerpt from the answer of the defendant in the action:

"The defendant states to the court that, had the plaintiff been able to secure the capital necessary to conduct the business, and had she been able to have carried out said contract, this defendant would have been ready and willing to have had the same carried out by her as representing the said Harmon Motorcar Company; that this defendant only terminated said contract when finally informed that neither the plaintiff nor the Harmon Motorcar Company would be able to fulfill the contract or carry it out by its terms or otherwise."

There was testimony given on behalf of the plaintiff in error to the effect that during Vogler's stay of about a week in Seattle he ascertained that the defendant in error had not the financial ability to carry out the contract of the Harmon Motorcar Company, and on

his return to Portland he directed the cancellation of the contract in and by this letter:

"Northwest Auto Co., Inc.

"Registered.                              Portland, Ore., Feb. 22, 1915.

"Harmon Motorcar Company, Seattle, Wash.—Gentlemen: We herewith give you notice that we are obliged to cancel the contract covering the sale of Reo cars and parts now existing between us. The factory advise that, owing to the condition of affairs at present existing in Seattle, for the best interests of all concerned, it is desirable that a change be made. We will call your attention also to the clause attached to the contract regarding the payment of a certain note, which note has not been paid as agreed. Under the circumstances, therefore, we will consider the contract canceled ten days from to-day, as per clause No. 3 in same.

"Yours very truly,                      Northwest Auto Company,
"WJC  E                                    By W. J. H. Clark, Secy."

Regarding the note referred to in the foregoing letter and in the contract, the evidence showed without dispute that it was fully paid long before the letter of cancellation was written—paid, it is true, in installments, but such installments were accepted by the plaintiff in error without any objection. It is needless to cite authorities to the effect that by such acceptance the plaintiff in error is bound.

The only other reason assigned for the breaking of the contract was "the condition of affairs" at the time existing in Seattle, by which, according to the brief of the plaintiff in error, was meant the financial inability of the defendant to carry out on behalf of the Harmon Motorcar Company its part of the contract. But the conclusive answer to that contention is that there was abundant evidence to the contrary, which the jury by its verdict found in effect to be true.

The remission made by the defendant in error of $893.95 from the amount of damages fixed by the jury appears to have been made lest it should be held that the estimates of selling the 43 cars remaining unsold at the time of the cancellation of the contract were erroneous. Looking at the whole record, we are unable to hold the verdict, thus corrected, unwarranted by the proof, and deeming it unnecessary to make special mention of any other points made in argument, the judgment is affirmed.